## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| ALTA MESA RESOURCES, INC., *et al.*, | ) |
| | ) Case No. 19-35133 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| DAVID DUNN, as Trustee of the AMH Litigation Trust, | ) |
| | ) |
| | ) Adv. Pro. No. _____ |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HPS INVESTMENT PARTNERS, LLC; ARM | ) |
| ENERGY HOLDINGS, LLC; ARM | ) **Jury Trial Demanded** |
| MIDSTREAM, LLC; AND ASSET RISK | ) |
| MANAGEMENT, LLC, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff David Dunn, as Trustee of the AMH Litigation Trust (the "**Trust**" or "**Plaintiff**"), the successor-in-interest to certain causes of action of Alta Mesa Holdings, LP ("**AMH**"), brings this action against HPS Investment Partners, LLC ("**HPS**"), ARM Energy Holdings, LLC ("**ARM Holdings**"), ARM Midstream, LLC ("**ARM Midstream**") and Asset Risk Management, LLC (together with ARM Holdings and ARM Midstream, "**ARM**"; ARM together with HPS, the "**Defendants**").

## INTRODUCTION

1.      AMH was an oil and gas exploration and production company that filed for bankruptcy in September 2019 after losing hundreds of millions of dollars and writing off billions of dollars in assets.  Indeed, after being valued at more than $2.25 billion in early 2018, AMH's

assets were sold in 2020 at liquidation prices for less than $200 million, leaving its creditors, the principal beneficiaries of the Trust, holding the bag. Due to the damages sustained by AMH, including from its resulting bankruptcy, creditors with more than $600 million in claims have been left with unpaid debts.

2.      AMH's ultimate demise was precipitated by years of transactions through which AMH's value was methodically stripped away to benefit the Defendants and other equity owners of AMH and Kingfisher Midstream, LLC ("**KFM**") at the expense of AMH's creditors.

3.      While the harmful actions of those equity holders were broad-reaching, this Complaint focuses on a series of transactions preceding the February 2018 business combination that were intended to, and did in fact, divert cash and other assets of AMH to KFM for the benefit of KFM's shareholders, particularly Defendants, who owned a substantial portion of KFM's equity interests.

4.      First, AMH was caused to enter into certain gathering agreements with KFM beginning in 2015, under which KFM and its shareholders reaped the benefits of exorbitant fees charged to AMH for years, and the onerous terms under which AMH agreed to effectively prop up the value of KFM for a potential sale.  Over $125 million was paid by AMH under these agreements during just a three-year period, and Defendants reaped the fruits of their value diversion strategy when they sold KFM in 2018 and received over $800 million in cash.

5.      Second, in connection with the 2018 business combination, AMH assigned all of its remaining non-STACK assets to High Mesa, Inc. ("**HMI**")—the entity through which HPS invested in AMH and KFM.  Despite that these assets were, at the time, generating positive net cash flow and valued in the tens of millions of dollars, AMH did not receive a penny of consideration from HMI or its shareholder, HPS.

6.      Instead, AMH entered into yet another agreement—a management services agreement with HMI—under which AMH, not HMI or its shareholder (HPS), would bear all of the up-front expenses of operating the newly-assigned non-STACK assets of HMI in exchange for only a nominal, below-market management fee and a right of reimbursement.  But HMI did not reimburse AMH.  HMI refused to pay, and ultimately left AMH with over $10 million of debt owed under the agreement, exclusive of interest, before it entered its own bankruptcy proceedings where that debt has remained unpaid.

7.      Through these transactions, the assets and value of AMH were purposefully and methodically diverted away from AMH, for the benefit of Defendants, in the years leading up to the February 9, 2018 business combination.  Defendants' actions all but ensured that AMH would ultimately lack the capital and liquidity to continue operating its business as a going concern. Sure enough, AMH was forced to file for bankruptcy in 2019 and sell its assets at liquidation prices in 2020.

8.      The Trustee, on behalf of the Trust, the successor-in-interest to the causes of action of AMH and its estate asserted herein, now brings this action to recover the substantial damages suffered as a result of transfers made and transactions entered into for the benefit of the Defendants. These transactions, including the obligations incurred by AMH and the transfers made by AMH, constituted fraudulent transfers under applicable bankruptcy and non-bankruptcy law and should be avoided.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this case under 28 U.S.C. § 157 and 1334.  This Complaint asserts core and non-core claims under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(2)(H).

10.      This Court also has jurisdiction over this case under 28 U.S.C. §§ 1332 and 1334 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and

is between citizens of different states.  David Dunn ("**Dunn**"), the Trustee of the Trust, is a citizen of Connecticut. On information and belief, Defendants are citizens of New York and Texas, and no defendant is a citizen of Connecticut.

11.     Venue is proper in this District under 28 U.S.C. § 1409 because AMH's bankruptcy case is pending in this District.  Further, on information and belief, a substantial part of the events or omissions giving rise to the claims occurred in this District.

12.     Pursuant to Federal Rule of Bankruptcy Procedure 7008 and Local Rule 7008-1, the Trust states that it hereby consents to the Bankruptcy Court's entry of final orders and judgment in this adversary proceeding, including if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## PARTIES AND RELATED ENTITIES

13.     The Trust was created in connection with the confirmed Chapter 11 plan for Alta Mesa Resources, Inc., and its AMH and Silver Run debtor affiliates[1] (the "**Bankruptcy Plan**"). Dunn was appointed trustee of the Trust on or about June 8, 2020, the effective date of the Bankruptcy Plan.

14.     Under the Bankruptcy Plan, causes of action held by AMH and its estate against certain third parties not released under the Bankruptcy Plan were assigned to the Trust.  The Bankruptcy Plan specifically provided that AMH did not release its claim against the Defendants in this action, and that AMH's claims against the Defendants were assigned to the Trust pursuant

---

[1] The debtors in the above-referenced chapter 11 cases are as follows: Alta Mesa Resources, Inc.; Alta Mesa Holdings, LP; Alta Mesa Holdings GP, LLC; OEM GP, LLC; Alta Mesa Finance Services Corp.; Alta Mesa Services, LP; Oklahoma Energy Acquisitions, LP; SRII Opco GP, LLC; SRII Opco, LP; Kingfisher Midstream, LLC; Kingfisher STACK Oil Pipeline, LLC; Oklahoma Produced Water Solutions, LLC; and Cimarron Express Pipeline, LLC.

to the Bankruptcy Plan and the order confirming the Bankruptcy Plan, for the benefit of the creditor beneficiaries of the Trust.

15.     On information and belief, defendant HPS Investment Partners, LLC (formerly known as Highbridge Principal Strategies), is a Delaware limited liability company, with its principal place of business in New York.  At all relevant times, HPS was a substantial equity owner of AMH and KFM and identified as one of the "Sponsor Parties" under the Bankruptcy Plan.

16.     On information and belief, defendant ARM Energy Holdings LLC is a Delaware limited liability company, with its principal place of business in Texas.  At all relevant times, ARM Energy Holdings LLC was an affiliate of defendants ARM Midstream and Asset Risk Management, LLC.  ARM was a founder and substantial equity holder of KFM.

17.     On information and belief, defendant ARM Midstream, LLC is a Delaware limited liability company, with its principal place of business in Texas.  At all relevant times, ARM Midstream, LLC was an affiliate of defendants ARM Holdings and Asset Risk Management, LLC. ARM was a founder and substantial equity holder of KFM.

18.     On information and belief, defendant Asset Risk Management, LLC is a Delaware limited liability company, with its principal place of business in Texas.  At all relevant times, Asset Risk Management, LLC was an affiliate of defendants ARM Holdings and ARM Midstream. ARM was a founder and substantial equity holder of KFM.

## FACTUAL BACKGROUND

**A.     Corporate Structures and Value-Stripping Transactions Leading up to the Business Combination in February 2018**

**a.     AMH Ownership Prior to February 2018**

19.     Alta Mesa Holdings, GP, LLC ("**AMH GP**") was the sole general partner of AMH. AMH GP's Board of Managers ("**Board**") conducted business on behalf of AMH. Prior to

February 2018, AMH was owned by its President and CEO Harlan Chappelle ("**Chappelle**"), its COO Michael Ellis ("**Ellis**"), and HMI, a privately held Delaware corporation.

20.     During the relevant time period, HMI was owned by HPS, Chappelle, Ellis and, beginning in 2016, Bayou City Energy Management LLC. Together, Chappelle, Ellis and HMI directly and indirectly owned and controlled AMH between 2015 and February 9, 2018.

### b.  The Creation of KFM and Diversion of AMH Value for HPS and ARM

21.     On information and belief, in 2014, AMH decided to ramp up its investment in an area of Oklahoma known as the STACK.[2] To transport its produced gas in Oklahoma, AMH had existing relationships with incumbent gatherers, and its oil was trucked and marketed by various other companies. However, AMH's owners resolved to take more control over AMH's midstream gathering needs. ARM and AMH, through Chappelle, began discussing jointly sponsoring a new entity to serve as AMH's midstream gatherer in the STACK.

22.     On information and belief, ARM saw an opportunity to finance and build out the gathering system, charge above-market rates to recoup its investment quickly, and flip the asset for a premium.  HPS soon jumped on board and agreed to invest, together with ARM, in the build-and-flip initiative, which would ultimately become KFM.

23.     On information and belief, early presentations of the proposed transaction detailed fees to be paid to KFM that were substantially greater than what AMH was being charged by its existing midstream gatherer.  Under the proposal, KFM's owners (including ARM and HPS) would benefit substantially on the back of AMH. HPS, along with Chappelle, championed the KFM project, in large part because Chappelle, together with Ellis and AMH's other owners, would become investors in KFM and realize profits through the exorbitant amounts to be paid by AMH.

---

[2] STACK is an acronym derived from the Sooner Trend oil field, Anadarko basin, and Canadian and Kingfisher counties. It refers to a geographic area in the Anadarko basin area of Oklahoma.

6

24.     On information and belief, ARM took full advantage of the conflicting financial interests of AMH's owners and prepared a series of financial analyses touting the purported advantages of paying above-market rates to KFM—appealing to the potential rewards that would flow to AMH's owners *by virtue of their equity stakes in KFM*. These analyses—or "marketing materials," as one ARM official regarded them—were presented to Chappelle and others in the months before any gathering agreements were signed by AMH.

25.     On information and belief, AMH's owners viewed KFM's rate structure with an eye to the benefits those rates would have for KFM and its owners, including HPS, Chappelle and Ellis. The KFM rates—which were substantially above market—were never meaningfully negotiated by AMH.  AMH's Board and owners likewise failed to pursue competitive offers from gatherers other than KFM, and actively spurned offers from other midstream gatherers, including offers of lower gathering rates. Despite KFM's above-market rates, AMH's Board voted to approve the 2015 agreements.

26.     On August 31, 2015, Chappelle executed the 2015 Gas Gathering and Processing Agreement and Crude Oil Gathering Agreement (together, "**2015 Agreements**") on behalf of AMH and, despite his conflicting interests, on behalf of KFM also.

27.     On information and belief, the pricing terms of the 2015 Agreements were virtually identical to those first proposed by ARM.  The gas base rates were well above market rates, and the capital recovery fees in both agreements made the rates exorbitant.  Indeed, the fees were so high that at times AMH was forced to sell its oil and gas at a loss.

28.     Both 2015 Agreements also included purported dedications of leasehold interests along with boilerplate language characterizing the agreements and their dedications as running with the land. These provisions purported to commit AMH, and any successor in interest to AMH,

to paying the inflated rates to benefit KFM. In addition, both 2015 Agreements included a promise by AMH to "convey or assign" easements or rights-of-way to KFM for the purposes of building and maintaining KFM's gathering systems. But, as the agreements explicitly state, the easements or rights-of-way were not conferred by the agreements themselves. Instead, they were to be conveyed to KFM sometime in the future, if at all, and only "where reasonably requested."

29.     On information and belief, within weeks of execution of the 2015 Agreements, AMH's managers openly questioned the exorbitant fees the company had agreed to pay. For every above-market dollar paid by AMH to KFM, only a small fraction would make it back to AMH. In effect, the value of AMH's production assets was being diverted to benefit KFM (in which AMH had no equity interest) and KFM's equity ownership, including HPS and ARM. Indeed, AMH learned that KFM was charging its other customers substantially less than it was charging AMH— which provided the overwhelming majority of KFM's business, and yet paid a higher price.

30.     On information and belief, the exorbitant fees made it difficult for AMH to remain profitable and harmed AMH's long-term value. AMH was loaded with debt, and nearly all of AMH's cash had been spent on the STACK play, leaving little for day-to-day operations. By mid-2016, Moody's downgraded AMH's debt, citing a "weak liquidity position, expected deterioration in credit metrics through 2017, and increasing refinancing risk." KFM's outrageous fees put AMH at risk of breaching its debt covenants.

31.     On information and belief, by the end of 2016, AMH was running at a net loss and was severely inadequately capitalized and cash-flow insolvent. AMH's financial problems were a concern for HPS. Between 80% and 90% of KFM's revenue was derived from AMH's gas and oil production, and KFM would be practically worthless if it lost its gathering contract with AMH.

This was a particular concern to HPS, which through its direct equity stake *and* its ownership of HMI held a larger interest in KFM than other owners of HMI.

32.     In addition, around the same time in 2016, a bankruptcy court had entered orders rejecting gathering agreements substantively identical to the 2015 Agreements on the ground that they did not constitute covenants that ran with the land. *In re Sabine Oil & Gas Corp.*, 547 B.R. 66 (Bankr. S.D.N.Y. 2016); *In re Sabine Oil & Gas Corp.*, 550 B.R. 59 (Bankr. S.D.N.Y. 2016). Thus, HPS was concerned that KFM would suffer the same fate if (or more appropriately, when) AMH needed to seek bankruptcy protection.  Thus, in 2016, AMH and KFM sought to amend the 2015 Agreements, but did so with an eye towards preserving the value of KFM for the "build-and-flip" objective.

33.     For its part, ARM sought to ensure that any restructuring of KFM rates would not reduce its net present value (and the value of ARM's investment in KFM), and landed on a proposal that would reduce the capital recovery fee in the gas gathering agreement. Critically, however, that proposed rate change was expected to have no negative effect on KFM, as the base gathering rates were actually increased.

34.     On December 1, 2016, AMH executed amended gathering agreements with KFM to supplant the 2015 Agreements (the 2016 Gas Amendment and 2016 Crude Oil Amendment are referred to collectively as the "**2016 Amendments**").  The rate changes set forth in the 2016 Amendments were never approved by the AMH Board or even put to a vote of the AMH Board or AMH's stakeholders.

35.     On information and belief, the 2016 Amendments were also designed, in part, as an attempt to insulate KFM's gathering agreements from challenge in bankruptcy similar to that in *Sabine*. Indeed, HPS threatened to withhold AMH's funding unless it accepted the amendments,

which HPS believed were necessary to protect its investment in KFM.  Thus, the 2016 Amendments included a host of additional provisions intended to transform the 2015 Agreements into covenants running with the land, including a purported conveyance of transportation interests. AMH received nothing in exchange for those purported conveyances.

36.     On information and belief, the 2016 Crude Oil Amendment additionally required KFM to construct a system capable of gathering up to 50,000 barrels per day for AMH.  KFM failed to construct such a system and never met the capacity threshold, but charged AMH for every barrel of oil that AMH paid another party to transport away—meaning KFM was being paid for doing nothing, and AMH was paying twice to move the same barrel of oil.

37.     On information and belief, between June 2016 and October 2019, AMH paid KFM over $120 million of exorbitant fees just under the gas gathering agreement alone, and millions more for transporting oil that KFM was incapable of transporting (and did not in fact transport).

38.     On information and belief, ARM and HPS profited handsomely from this diversion of value from AMH to KFM, as designed.  In connection with the business combination in February 2018, ARM sold its interest in KFM for hundreds of millions in cash and stock—a substantial multiple of the initial capital investment that ARM had made less than three years earlier.

**B.     The February 2018 Business Combination and Related Transactions to Benefit HPS at the Expense of AMH and its Stakeholders**

39.     On February 9, 2018, AMH entered into a business combination with Silver Run II Acquisition Corporation ("**Silver Run**") and KFM (the "**Business Combination**"). Silver Run was a special purpose acquisition vehicle founded and run by Riverstone VI Alta Mesa Holdings, L.P., which had raised over $1 billion through an IPO in 2017.  As a result of the Business Combination, AMH and KFM both became wholly-owned subsidiaries of a holding company,

SRII Opco, LP ("**SRII Opco**").  AMH continued to be managed by its general partner, AMH GP, which was majority owned and controlled by SRII Opco. The public company formerly known as Silver Run, which was rebranded as Alta Mesa Resources, Inc. ("**AMR**"), owned 100% of SRII Opco's general partner interest and a substantial portion of the limited partner interests in SRII Opco.  AMR was, at all relevant times after February 2018, beneficially owned by a number of entities, with HPS and HMI both holding substantial shares.

40.     The Business Combination stemmed from three related contribution agreements executed on August 16, 2017 memorializing the terms of the Business Combination: the Alta Mesa Contribution Agreement, the Kingfisher Contribution Agreement, and the Riverstone Contribution Agreement (collectively, the "**Contribution Agreements**").  The Contribution Agreements and the terms of the Business Combination transaction embodied therein reflected a structure designed to "cash out" the owners of KFM—who sought to consummate their "build-and-flip" strategy and realize the fruits of propping up KFM on the backs of AMH's creditors—and provide going-forward equity ownership in Silver Run/AMR to AMH's owners.  Over $800 million in cash, along with significant equity, was paid to HPS, ARM and the other KFM owners in consideration for AMR's purchase of KFM and AMH.

41.     In addition, the Business Combination contemplated and involved several related transactions intended to benefit HMI and its owners, including HPS, at the expense of AMH and its creditors.

42.     First, on February 8, 2018—two days after Silver Run stockholders approved the Business Combination through the Contribution Agreements, and one day before the Business Combination closed—AMH assigned its remaining non-STACK assets (the "**Non-STACK Assets**") to High Mesa Holdings, LP ("**HMH**"), a subsidiary of HMI, *for no consideration* (the

"**Non-STACK Assignment**").  Indeed, neither AMH nor HMI obtained any third-party valuation or fairness opinion regarding the zero-dollar price paid by HMI/HMH.  At the time of the assignment, the Non-STACK Assets were valued at tens of millions of dollars and were generating positive cash flow prior to the assignment.

43.     Second, in connection with the Business Combination and the transfer of the Non-STACK Assets by AMH, AMH entered into a management services agreement with HMI (the "**HMI MSA**").  Chappelle signed the HMI MSA on February 9, 2018, on behalf of both AMH and HMI.  Under the HMI MSA, AMH was obligated to provide payroll, expenses, and other services to HMI in exchange for HMI's reimbursement of all expenses AMH incurred on behalf of HMI, along with a nominal $10,000/month management fee.

44.     Specifically, AMH agreed to provide the cash to pay HMI's employees, general and administrative overhead, and service expenses; among the categories for which AMH was entitled to reimbursement were direct payroll, indirect payroll, billable payroll, overhead allocation, and invoices paid on behalf of HMI.  The nominal monthly management fee was also well-below market standards.

45.     On information and belief, HMI was not an operating company prior to assignment of the Non-STACK Assets, and would have been unable to manage its newly-assigned assets without AMH's assistance.  However, AMH never consulted any third parties or did any studies of what an appropriate monthly management fee would be, or whether HMI was able or likely to pay the amounts that would be owed to AMH.  Nor did AMH or its owners (also owners of HMI) seek or offer any guaranty or other security for payment of the obligations to AMH under the HMI MSA.

46.     Instead, and while AMH had no obligation to support HMI (in which it had no interest), or the further operation of the Non-STACK Assets post-assignment, HMI and its owners (including HPS) ensured any financial risk associated with the assignment was borne by AMH and its creditors—not HMI or its shareholders.  Ultimately, the risk thrust on AMH by HMI and its shareholders, including HPS, came home to roost, as HMI failed to pay approximately $10 million owed to AMH under the HMI MSA.

47.     On or about January 24, 2020, HMI commenced a voluntary chapter 7 bankruptcy case in this Court.  The amounts owed to AMH under the HMI MSA, totaling approximately $10 million, exclusive of contractual interest at 10% per annum, remain outstanding and unpaid.

48.     In essence, as a result of the Non-STACK Assignment and the HMI MSA, HMI and its shareholders (including HPS) received the value of the Non-STACK Assets and the services rendered to operate those assets for no consideration.

## JURY TRIAL DEMANDED

49.     The Trust hereby demands a jury trial on all issues.

## CAUSES OF ACTION

### Count 1: Avoidance and Recovery of Fraudulent Transfer against HPS and ARM

### (Gathering Agreements)

### (11 U.S.C. §§ 544, 548, 550; Tex. Bus. & Com. § 24.001, et. seq.)

50.     The Trust repeats and realleges the allegations set forth above.

51.     On information and belief, the 2015 Agreements and 2016 Amendments, as such agreements were further amended from time to time (collectively, the "**Gathering Agreements**"), were devised as a mechanism to divert value away from AMH and its creditors to benefit KFM's owners, particularly HPS and ARM, through exorbitant above-market fees, overbearing terms and obligations imposed on AMH that had no industry precedent.

13

52.     On information and belief, the obligations of AMH under the Gathering Agreements (the "**Gathering Agreement Obligations**"), and the payments made by AMH thereunder, which during the period of September 2015 through September 11, 2019 (the "**AMH Gathering Payments**") totaled over $120 million, were incurred and made with actual intent to hinder, delay, or defraud any entity to which AMH was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

53.     On information and belief, AMH received less than reasonably equivalent value in exchange for incurring the Gathering Agreement Obligations and making the AMH Gathering Payments.

54.     On information and belief, at the time the Gathering Agreement Obligations were incurred, and each of the AMH Gathering Payments were made, AMH (i) was insolvent, or became insolvent as a result of such transfer or obligation, (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with AMH was an unreasonably small capital, or (iii) intended to incur, or believed that AMH would incur, debts that would be beyond AMH's ability to pay as such debts matured.

55.     On information and belief, some or all of the AMH Gathering Payments were made to or for the benefit of an insider for an antecedent debt, when AMH was insolvent, and when KFM, HPS and ARM had reasonable cause to believe AMH was insolvent.

56.     The Gathering Agreement Obligations and the AMH Gathering Payments constitute fraudulent transfers avoidable by Plaintiff under 11 U.S.C. §§ 544, 548 and Tex. Bus. & Com. § 24.001 *et seq*.

57.     The Gathering Agreement Obligations were incurred, and the AMH Gathering Payments were made, for the benefit of HPS and ARM as the owners of KFM and, as applicable, subsequent transferees of any distributions made by KFM of the proceeds of such transfers.

58.     Upon avoidance of the obligations and transfers alleged herein, Plaintiff is entitled to recover judgment from Defendants pursuant to 11 U.S.C. § 550(a)(1) and/or (2).

59.     At the time the Gathering Agreement Obligations were incurred and the Gathering Agreement Payments were made, a creditor existed who held an unsecured claim allowable under 11 U.S.C. § 502.

### Count 2: Avoidance and Recovery of Fraudulent Transfer against HPS

### (Non-STACK Assignment)

### (11 U.S.C. §§ 544, 548, 550; Tex. Bus. & Com. § 24.001, et. seq.)

60.     The Trust repeats and realleges the allegations set forth above.

61.     On information and belief, the Non-STACK Assignment was intended to divert value away from AMH and its creditors to benefit HMI's owners, particularly HPS, by conveying the Non-STACK Assets, which were valued at tens of millions of dollars and were generating positive cash flow, for no consideration.

62.     On information and belief, the transfer of the Non-STACK assets pursuant to the Non-Stack Assignment was made with actual intent to hinder, delay, or defraud any entity to which AMH was or became, on or after the date that such transfer was made, indebted.

63.     On information and belief, AMH received less than reasonably equivalent value in exchange for transferring the Non-STACK Assets pursuant to the Non-STACK Assignment.

64.     On information and belief, at the time of the Non-STACK Assignment, AMH (i) was insolvent, or became insolvent as a result of such transfer, (ii) was engaged in business or a

transaction, or was about to engage in business or a transaction, for which any property remaining with AMH was an unreasonably small capital, or (iii) intended to incur, or believed that AMH would incur, debts that would be beyond AMH's ability to pay as such debts matured.

65.     On information and belief, the Non-STACK Assignment was made in whole or in part, to or for the benefit of an insider for an antecedent debt, when AMH was insolvent, and when HMI and/or HPS had reasonable cause to believe AMH was insolvent.

66.     The Non-STACK Assignment was made for the benefit of HPS as the owner of HMI and, as applicable, subsequent transferee of any distributions made by HMI of the proceeds of such transfer.

67.     The Non-STACK Assignment constitutes a fraudulent transfer avoidable by Plaintiff under 11 U.S.C. §§ 544, 548 and Tex. Bus. & Com. § 24.001 *et seq.*

68.     Upon avoidance of the transfer alleged herein, Plaintiff is entitled to recover judgment from HPS pursuant to 11 U.S.C. § 550(a)(1) and/or (2).

69.     At the time such transfer was made, a creditor existed who held an unsecured claim allowable under 11 U.S.C. § 502.

**Count 3: Avoidance and Recovery of Fraudulent Transfer against HPS**

**(HMI MSA)**

**(11 U.S.C. §§ 544, 548, 550; Tex. Bus. & Com. § 24.001, et. seq.)**

70.     The Trust repeats and realleges the allegations set forth above.

71.     On information and belief, the HMI MSA was a vehicle through which HMI and its shareholder, HPS, shifted the financial burden and risk of operating the Non-STACK Assets to AMH and its creditors.  By executing the HMI MSA, AMH became obligated to pay HMI's employees, general and administrative overhead, and services expenses of operating the Non-

16

STACK Assets—which had been transferred by AMH for no consideration—in exchange for only a nominal, below-market management fee and a soon-to-be-broken promise of expense reimbursement.  Ultimately, HMI failed to pay approximately $10 million owed to AMH under the HMI MSA for services AMH provided and expenses it advanced, despite HMI and its shareholders, including HPS, reaping the benefits of such services.

72.     On information and belief, the obligations of AMH under the HMI MSA (the "**MSA Obligations**"), and the payments made for the benefit of HMI thereunder from the period of February 9, 2018 through termination of the MSA (the "**MSA Payments**"), were incurred and made with actual intent to hinder, delay, or defraud any entity to which AMH was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

73.     On information and belief, AMH received less than reasonably equivalent value in exchange for incurring the MSA Obligations and making the MSA Payments.

74.     On information and belief, at the time the MSA Obligations were incurred, and each of the MSA Payments were made, AMH (i) was insolvent, or became insolvent as a result of such transfer or obligation, (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with AMH was an unreasonably small capital, or (iii) intended to incur, or believed that AMH would incur, debts that would be beyond AMH's ability to pay as such debts matured.

75.     On information and belief, some or all of the MSA Payments were made to or for the benefit of an insider for an antecedent debt, when AMH was insolvent, and when HMI and/or HPS had reasonable cause to believe AMH was insolvent.

76.     The MSA Obligations and the MSA Payments constitute fraudulent transfers avoidable by Plaintiff under 11 U.S.C. §§ 544, 548 and Tex. Bus. & Com. § 24.001 *et seq*.

77.     The MSA Obligations were incurred, and the MSA Payments were made, for the benefit of HPS as the owner of HMI and, as applicable, subsequent transferee of any distributions made by HMI of the proceeds of such transfers.

78.     Upon avoidance of the obligations and transfers alleged herein, Plaintiff is entitled to recover judgment from HPS pursuant to 11 U.S.C. § 550(a)(1) and/or (2).

79.     At the time the MSA Obligations were incurred and the MSA Payments were made, a creditor existed who held an unsecured claim allowable under 11 U.S.C. § 502.

## REQUEST FOR RELIEF

THEREFORE, Plaintiff respectfully prays that Defendants be cited to appear and answer herein, and that upon trial of this cause, judgment be entered in Plaintiff's favor, and against Defendants, for the following:

a.     For a determination that the Gathering Agreement Obligations and AMH Gathering Payments were fraudulent transfers within the meaning of 11 U.S.C. §§ 544, and 548 and Tex. Bus. & Com. § 24.001, *et seq.*, and for entry of judgment against HPS and ARM in the amount of the avoided transfers, but in any event no less than $85 million;

b.     For a determination that the Non-STACK Assignment was a fraudulent transfer within the meaning of 11 U.S.C. §§ 544, and 548 and Tex. Bus. & Com. § 24.001, *et seq.*, and for entry of judgment against HPS in the amount of the avoided transfer, but in any event no less than $42 million;

c.     For a determination that the MSA Obligations and MSA Payments were fraudulent transfers within the meaning of 11 U.S.C. §§ 544, and 548 and Tex. Bus. & Com.

§ 24.001, *et seq.*, and for entry of judgment against HPS in the amount of the avoided transfers, but in any event no less than $12 million;

d.     Pre- and post-award interest at the highest rate and amount authorized by applicable law;

e.     An award of costs related to this proceeding, including attorneys' fees, as permitted by contract or applicable law; and

f.     Such other and further relief at law or in equity as the Court deems just and appropriate.

Dated:  September 10, 2021

MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, PC

*/s/ Joseph R. Dunn*
Joseph R. Dunn (*Pro Hac Vice Pending*)
Attorney-in-Charge
CA State Bar No. 238069
jrdunn@mintz.com
3580 Carmel Mountain Rd.
Suite 300
San Diego, California 93210
T: (858) 314-1500
F: (858) 314-1501

Abigail V. O'Brient (*Pro Hac Vice Pending*)
CA State Bar No. 265704
aobrient@mintz.com
2029 Century Park East
Suite 3100
Los Angeles, California 90067
T: (310) 586-3200
F: (310) 586-3202